## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In Re:<br><br>Gregory A. Johnson,<br><br>       Debtor. | Bankruptcy No.: 20-30578<br>Chapter 11 Subchapter V |
| United Pulse Trading Inc.<br>d/b/a AGT Foods USA,<br><br>       Plaintiff,<br><br>   vs.<br><br>Gregory A. Johnson,<br><br>       Defendant. | Adversary No.: 21-07004 |

## MEMORANDUM AND ORDER

Plaintiff United Pulse Trading Inc. filed a Complaint seeking a determination that

Debtor/Defendant Gregory A. Johnson's debt to it is excepted from discharge under 11

U.S.C. § 523(a)(2), (4) and (6).  Several months later, United Pulse filed an Amended

Complaint, requesting the Court to liquidate the debt and to enter a money judgment in

its favor.  United Pulse asserts Debtor made false representations to United Pulse,

committed defalcation while acting in a fiduciary capacity, embezzled United Pulse's

money, and willfully and maliciously injured United Pulse.  In his Answer to the

Amended Complaint, Debtor denies the allegations.

At the Final Pretrial Conference, United Pulse expressly waived its cause of

action under section 523(a)(4) related to Debtor's alleged embezzlement and

defalcation while acting in a fiduciary capacity.  The Court tried the remaining causes of action under section 523(a)(2) and (6) on August 2 and 3, 2022.  For the reasons that follow, United Pulse's Complaint and causes of action are dismissed with prejudice.

## I.   FACTUAL BACKGROUND

### A.   Premier Pulses and North Dakota Port Services

In 1999, Debtor formed Premier Pulses, International, Inc.   From the time of its inception, Debtor served as President and Chief Executive Officer (CEO) of Premier Pulses, and he owned two-thirds of its shares.[1]  At first, Premier Pulses purchased and processed agricultural products from farmers, selling some of the processed products domestically and exporting others.  In 2011, Premier Pulses sold its physical assets and changed its business model, shifting its focus to agricultural merchandising and trading.

In 2007, Debtor created North Dakota Port Services, Inc.  He served as the President and CEO of this corporation as well.  As with Premier Pulses, Debtor owned two-thirds of North Dakota Port Services' shares.[2]  North Dakota Port Services provided transportation services to agricultural, energy, construction and other business sectors. According to Debtor, Premier Pulses loaned North Dakota Port Services money in 2007 and 2008 as a part of North Dakota Port Services' "start up."  North Dakota Port Services repaid the loans, and Premier Pulses continued to loan money to North Dakota Port Services on an "as-needed" basis over the years.

---

[1] John Stewart owned the other one-third of Premier Pulses' shares.  Stewart was not involved in the day-to-day operations of Premier Pulses.

[2] Stewart owned the other one-third of North Dakota Port Services' shares.  He was not involved in the day-to-day operations of North Dakota Port Services.

North Dakota Port Services' business grew to include intermodal transportation, which involves transporting goods in containers for domestic and international trade.[3] Debtor believed that intermodal shipping offered genuine economic opportunities for North Dakota.  Prompted by this belief, Debtor (through North Dakota Port Services) began developing an intermodal facility.  He aspired to create a facility that would become a transportation hub serving the upper midwestern region.

In 2011, BNSF Railway, a carrier North Dakota Port Services used, informed North Dakota Port Services that BNSF would begin requiring intermodal facilities to meet certain standards.  Specifically, BNSF required North Dakota Port Services' intermodal facilities to "arrive a train, depart a train, and have a track for a runaround." Although North Dakota Port Services' existing site operated on property adjacent to BNSF's main highline rail, the site could not accommodate these demands.  According to Debtor, if North Dakota Port Services could not find a way to meet BNSF's requirements, North Dakota Port Services would "lose intermodal."  North Dakota Port Services and BNSF agreed that BNSF would grant North Dakota Port Services a "certain amount of time to get to a point where [North Dakota Port Services] would be able to land that train."

North Dakota Port Services made substantial progress toward its intermodal facility goals.  It built an office, completed subsurface and sewer/water work, leveled the site to ready it for rail installation, and installed 16,000 feet of track on three tracks. According to Debtor, the intermodal project was "up and running" and North Dakota Port

_____

[3] According to Debtor, intermodal shipping reduces spoilage in farm products. After the product is loaded into a shipping container, it remains in the container, and the container is transported from truck to train to cargo ship.

Services began capturing business transporting various materials by rail to "help carry bills forward."  Debtor claimed intermodal shipping comprised the largest and most profitable percentage of North Dakota Port Services' business from 2011 to 2013.

The remaining work to finish the intermodal facility included expansion to meet BNSF's demands.  Specifically, North Dakota Port Services needed to acquire substantial additional land; perform significant dirt work; complete additional sewer, water and storm drainage services; perform environmental work; install track; and attract additional companies to locate at the facility to support the development. According to Debtor, this remaining work required "a lot of money."  Consequently, North Dakota Port Services sought investors "interested in transportation and intermodal to take this to the level we needed."

While North Dakota Port Services sought investors, a local bank provided interim financing.[4]  Premier Pulses also resumed lending North Dakota Port Services money to fund North Dakota Port Services' operations while it sought investors, beginning with a $60,000 loan in August 2012.  Premier Pulses loaned North Dakota Port Services an additional $60,000 in September 2012, $155,000 in October 2012, and $160,000 in December 2012.  According to Debtor, North Dakota Port Services used the borrowed funds on real estate development, wages and other general operating expenses. Debtor executed a promissory note on behalf of both Premier Pulses and North Dakota Port Services for each loan Premier Pulses made to North Dakota Port Services. Debtor also personally loaned North Dakota Port Services $570,000 in 2012 to keep it

---

[4] North Dakota Port Services exhausted its interim financing in early 2013.

afloat while Debtor searched for an investor.[5]  Debtor expected North Dakota Port Services to repay all these loans when it found an investor.

In December 2012, Debtor engaged William Sprague, an investment banker who worked with private equity firms, to help North Dakota Port Services find an investor. Initially, North Dakota Port Services agreed to work exclusively with Sprague on a contingency-fee basis.  Sprague identified and connected North Dakota Port Services to numerous possible investors.  Debtor estimated that North Dakota Port Services completed "between eight and twelve, I would guess, formal visits or phone calls with . . . potential investors" in early 2013.

Globalvia, a Spanish company interested in purchasing North Dakota Port Services to establish a North American presence, was among the early potential investors.  In February 2013, North Dakota Port Services agreed to an exclusivity period with Globalvia.  Globalvia began its due diligence and sent accounting and engineering teams to visit North Dakota Port Services.  North Dakota Port Services employed a legal team based in New York to assist with the intricacies of an international sale.  The entities negotiated for several months.

In April 2013, the various representatives of Globalvia and North Dakota Port Services met in New York to conclude negotiations and review documents.  Globalvia and North Dakota Port Services reached a verbal agreement and tasked their respective teams with working out the last of the details and finalizing the deal after the meeting.

---

[5] Debtor funded the loan with his share of the proceeds of the sale of Premier Pulses' physical assets in 2011.

Representatives of Globalvia and North Dakota Port Services anticipated meeting again in New York at the end of June to finalize the sale and to discuss the logistics of forming the new company, The Port of North Dakota, LLC.  Approximately ten days before the closing date, Globalvia withdrew from the deal.  Debtor never learned why Globalvia abandoned the project.

At that point, Sprague and North Dakota Port Services reinitiated discussions with other potential investors they met before Globalvia.  Sprague also called other contacts to generate and gauge interest in North Dakota Port Services.  According to Debtor, "We had stuff that would build—it would fall apart.  It would build—it would fall apart.  Some would be just a 'no.'  Others would be a 'yes.'"  Although he could not specify, Debtor testified that he and Sprague contacted or met with "a large number" of investors in 2013.

While Debtor was searching for investors throughout 2013, Premier Pulses loaned a total of $2,385,000 in 29 separate transactions to North Dakota Port Services.[6] Debtor executed promissory notes on behalf of both parties related to each loan.

Debtor also personally loaned North Dakota Port Services additional money.  As of December 31, 2013, North Dakota Port Services owed Debtor a total of $810,000 (excluding interest).  According to Debtor, he continued to believe that North Dakota Port Services would pay back the loans from him and Premier Pulses through investments.

---

[6] North Dakota Port Services' 2013 balance sheet lists debt to Premier Pulses totaling $2,510,000, including $94,068.32 in interest, as of December 31, 2013.

Beginning in 2014, North Dakota Port Services could no longer use its intermodal capacities because it was unable to meet BNSF's requirements.  Also in 2014, Sprague agreed to release North Dakota Port Services from the exclusivity agreement.

In March or April 2014, Premier Pulses engaged another individual, Ralph Murphy, to locate potential investors to fund the intermodal project.  Murphy informed Debtor that he knew a wealthy individual interested in investing in a business that would create jobs and add value to the community.  According to Debtor, he "pressed hard" to learn the identity of the investor, but Murphy declined to share the name, claiming he was "under strict confidentiality."  Murphy reviewed the information Debtor shared about the investment opportunity and told Debtor it seemed like a good fit.

North Dakota Port Services and the potential investor, through Murphy, negotiated terms of the sale and/or investment in the corporation.  North Dakota Port Services' local counsel and Murphy drafted purchase agreements for approximately 3,000 acres of property.  North Dakota Guaranty held the purchase agreements, and the parties agreed to a closing date.  Murphy told Debtor that "Tenth Prime Trust" would be contributing the funds for the investment, and Murphy "was going to be a partner of ours through whatever funding mechanism he was arranging with Tenth Prime Trust."  Murphy communicated his full confidence to Debtor that "things were going to come in."  Debtor signed the agreements in approximately September 2014.  Debtor understood that Murphy's client or the client's representative would sign the agreements and deposit the funds, but the funds never appeared in the designated escrow account.  Although the deal did not consummate at that time, Debtor continued discussions with

7

Murphy.  In fact, Debtor testified at trial that he still communicates with Murphy, and that Murphy claims that he is still "working on it."

In the meantime, Sprague continued searching for other investors and interim financing for North Dakota Port Services to, according to Debtor, "clean up our debt at that time to Premier Pulses which would enable us to clean up our debt to United Pulse."  In April 2014, one potential investor Sprague contacted offered interim financing and sent a $4 million check to North Dakota Port Services.  Debtor planned to use the $4 million to cover North Dakota Port Services' debt to Premier Pulses and to provide funding for operating, but the bank returned the check for insufficient funds after North Dakota Port Services tried to deposit it.  Although Sprague talked to the potential investor after the check bounced, nothing more came of the potential investment.

Sprague identified and presented additional potential investors to North Dakota Port Services, evidenced by emails between Sprague and Debtor discussing possible investment deals.  The last email, dated March 14, 2015, references an investor who "wants to mover [sic] forwrad [sic]" and a possible May 1 closing.  Ex. 230.

In his answers to interrogatories provided in conjunction with this case, Debtor listed 33 potential investors.  Ex. T-40.  The "investors" included investment brokers and possible sources of interim financing.  At trial, Debtor testified about each person or entity listed and detailed the extent of the discussions with each potential investor and the approximate timeframe of their interest (which ranged from 2011 to 2018).

Despite the efforts of Sprague, Murphy and Debtor, an investment never materialized.  More specifically, none of the conversations with potential investors

resulted in an agreement signed by North Dakota Port Services and an investor. Debtor testified that he did not know why they declined to invest.

At trial, Debtor insisted that the information he received from Sprague and Murphy led him to confidently believe that several different people or entities were genuinely interested in investing in or providing financing for North Dakota Port Services. The Court received numerous emails buttressing this testimony.

To generate funding necessary to maintain operations and to demonstrate progress in the development of the intermodal facility to potential investors, North Dakota Port Services continued to borrow additional funds from both Debtor and Premier Pulses. The following table summarizes the loan debt North Dakota Port Services owed to Debtor and Premier Pulses during the relevant years:

| Year | NDPS' Total Debt to PP | NDPS' Total Debt to Debtor | |
|------|------------------------|----------------------------|------|
| 2012 | 334,135.70 | 570,000 | T-14 |
| 2013 | 2,604,065.32 | 850,295.81 | T-15 |
| 2014 | 5,239,921.34 | 882,695.81 | T-16 |
| 2015 | 6,098,587.67 | 1,212,619.10 | T-17 |
| 2016 | 7,389,542.87 | 1,550,120.86 | T-18 |

According to Debtor, he continued to loan North Dakota Port Services money from his personal finances with the expectation that investors would provide the funds necessary to operate North Dakota Port Services and repay him and Premier Pulses in full.

North Dakota Port Services' net income totaled $742,632.39 in 2011, but it realized negative net income from 2012 through 2016.[7] Its total equity decreased every

---

[7]
| 2012 | $-649,310.27 |
|------|--------------|
| 2013 | $-4,619,613.10 |
| 2014 | $-2,145,648.89 |
| 2015 | $-1,330,366.24 |
| 2016 | $-2,509,844.94 |

year during the same period, from $-286,084.40 in 2011 to $-11,550,277.70 in 2016.[8]

**B.    United Pulse and Premier Pulses**

United Pulse sources food products.  More specifically, it purchases food products from producers, processes them and sells them as ingredients to customers around the world.

In 2007, United Pulse began contracting with the United States Department of Agriculture (USDA) for the sale of raw food materials to distribute as international food aid.  According to United Pulse's head of operations, Eric Bartsch, USDA gives preferential treatment to small businesses by reserving some contracts related to food aid programs for them.  With fewer than 500 employees, United Pulse qualified as a small business from 2007 to 2011.  By 2011, United Pulse's business grew to such a degree that it no longer qualified as a small business.  To circumvent ineligibility for preferential bidding, United Pulse began contracting with Premier Pulses—which qualified as a small business—to submit bids and to contract with USDA.  Beginning in late 2011, United Pulse and Premier Pulses followed the same routine.  When USDA announced available contracts, United Pulse formulated bids on contracts reserved for small businesses and presented them to Premier Pulses.  According to Bartsch, Premier Pulses added its fee (typically $5 per metric ton) to United Pulse's bids and submitted the revised bids to USDA.  Aside from adding its commission to the bid total, Premier Pulses did not provide any input on the sums of bids or any other contract

---

[8]      2012   $-944,804.53
         2013   $-5,564,417.63
         2014   $-7,710,066.52
         2015   $-9,040,432.76

terms.  If USDA awarded a contract to Premier Pulses, USDA sent the contract
specifications to Premier Pulses, which in turn sent them to United Pulse.  United Pulse
fulfilled the contract.  When the product United Pulse shipped reached the designated
port, United Pulse invoiced Premier Pulses, and Premier Pulses invoiced USDA.  USDA
paid Premier Pulses within 10 days of receiving an invoice.  After withholding its
commission, Premier Pulses remitted the remainder of the payment to United Pulse.

This relationship with Premier Pulses proved satisfactory to United Pulse until
March 2014.  United Pulse employees noticed that it was not receiving all the contract
proceeds it expected, and the sum Premier Pulses owed it began growing.  They also
noticed that Premier Pulses stopped referencing specific contracts with its payments to
United Pulse.

Bartsch contacted Debtor to inquire about Premier Pulses' overdue balance.
Debtor conceded that Premier Pulses did not have the funds to pay United Pulse its
share of the USDA contract proceeds because it loaned money to North Dakota Port
Services.  He explained that North Dakota Port Services expected investors to send
funds soon, and the loans were simply meant to "bridge the gap" until the funds
arrived.[9]  Consistent with Debtor's claim that he was soliciting investment funding for
North Dakota Port Services, Bartsch recalled a potential investor in North Dakota Port
Services contacting him.  Bartsch understood that the delay in Premier Pulses'
payments to United Pulse resulted from North Dakota Port Services' inability to repay its
loans to Premier Pulses because North Dakota Port Services received no infusion of

---

[9] For context, during the spring of 2014, North Dakota Port Services received a
$4 million check from a potential investor, which the bank ultimately returned for
insufficient funds.

investment income as expected.  He further understood that, when North Dakota Port Services received investment income, it would repay Premier Pulses and Premier Pulses would pay United Pulse, with interest.

Despite learning that Premier Pulses used USDA payments owed to United Pulse to make loans to North Dakota Port Services, United Pulse did not immediately demand payment from Premier Pulses.  Likewise, United Pulse did not demand that Premier Pulses stop loaning United Pulses' share of the proceeds from USDA contracts to North Dakota Port Services.

By May 2014, United Pulse knew Premier Pulses owed it more than $1 million. Debtor assured Bartsch that North Dakota Port Services was still working to secure investments, which it would use to pay Premier Pulses, and Premier Pulses would then pay United Pulse.

On May 22, 2014, Bartsch emailed United Pulse's Chief Executive Officer and Chief Operating Officer about the situation.  Bartsch explained:

> Basically [Debtor] had 175 million wired to his account from an investor and now the bank has froze it.  [Debtor] does not have access to the money and now he cannot pay us on those invoices because he does not have the money.  We have new usda money coming in from May due dates that he has access to that he is sending to us.  Right now we have a million tied up with [Debtor] that is past due and 3.8 million total.
>
> *     *     *
>
> [Debtor] said he will have resolved shortly and all money will be sent to us right away.  He may but at this point I don't trust him anymore.

Ex. T-39.  At trial, Bartsch explained that the million dollars he referenced related to the sum Debtor claimed was "tied up" in North Dakota Port Services, and the $3.8 million related to the total sum Premier Pulses owed United Pulse.  Bartsch also explained that

Debtor lost his trust because "we were missing the money—the money was supposed
to be transferred directly to United Pulse Trading versus being used to run another
business."

      Faced with the situation, United Pulse considered its options.  It contemplated
demanding collateral for the debt.  According to Bartsch, United Pulse declined to
pursue this option because it discovered that "there maybe wasn't the collateral there to
leverage against it.  Basically, there wasn't a whole lot to get."  It also considered
suspending its business relationship with Premier Pulses.  Instead, United Pulse opted
to continue working with Debtor, "hoping the investment money would come in."
Bartsch explained that United Pulse wanted to "maintain the working relationship to
hopefully recover the funds."

      Bartsch communicated with Debtor weekly about the anticipated investment(s)
and the status of the funds, and Debtor continued to assure Bartsch he was "working on
it" and hoped to receive the money soon.  According to Bartsch, most of their
conversations were by phone, but some were by email.  On July 30, 2014, Bartsch
emailed Debtor about the status of the funds from one such investor.  Referencing the
investment from Murphy's client, Debtor responded, "I am expecting the funds no later
than Tuesday.  I am hoping to possibly see them as early as tomorrow afternoon."  Ex.
T-38. at 1.  Debtor sent this response on a Thursday.  The following Monday, Debtor
expressed cautious optimism, reporting: "I was told tonight . . . my funding was to be
available possibly Wednesday sometime. I do not count on it till it happens anymore but
I am passing the message on.  Once I have the funding available to me we will get all
accounts caught up within a couple of days."  Id. at 2.  Bartsch explained that Debtor

repeatedly claimed issues with the investor's bank caused the funding delay.

Specifically, Bartsch understood the investor's bank was concerned about its viability if

the investor withdrew all her money—purportedly $175 million.

United Pulse remained willing to continue contracting with Debtor and Premier

Pulses despite the growing debt and delay in payments, but it demanded some

guarantee of payment.  On August 29, 2014, United Pulse and Premier Pulses entered

a Reaffirmation Agreement.  The agreement provided that Premier Pulses owed United

Pulse $3,500,000, and Premier Pulses agreed to pay the debt in full.  On the same

date, Debtor signed a Personal Guaranty securing the debt.  According to Bartsch,

United Pulse was trying to "leverage anything we can for the debt owed to us—the

personal guaranty was one way of doing that."  United Pulse did not request a financial

statement, balance sheet, profit and loss statement or any other documentation

substantiating Premier Pulses' or Debtor's ability to repay the debt.  Further, neither of

the agreements prohibited Premier Pulses from loaning additional funds to North

Dakota Port Services with the USDA contract proceeds Premier Pulses owed to United

Pulse.

Despite United Pulse's repeated demands for its share of USDA contract

proceeds and the reaffirmation agreements Debtor and Premier Pulse signed to secure

repayment of these funds, Premier Pulses continued its practice of loaning money to

North Dakota Port Services.  Six days after the parties signed the reaffirmation

agreement, Premier Pulses loaned North Dakota Port Services $75,000.  In fact,

Premier Pulses granted four loans totaling $315,000 to North Dakota Port Services in

September 2014.

For the next several months, Bartsch continued to ask Debtor for updates, and Debtor continued to report issues with the investor's bank.  On January 10, 2015, Debtor emailed Bartsch and told him that North Dakota Port Services had not yet received the investment money, but that Debtor was considering other funding and investment sources.

In October 2016, Premier Pulses still owed a significant sum to United Pulse.  At that point, United Pulse considered investing in or buying North Dakota Port Services and operating it to recover the debt Premier Pulses owed.  The viability of this option depended on the value of North Dakota Port Services and the equity in the company. United Pulse hired an accounting firm to review North Dakota Port Services' financial statements.  According to Bartsch, United Pulse abandoned the prospect because North Dakota Port Services demanded too much money given its assets, value and debt to banks and other creditors.

From August 23, 2012, to November 8, 2016, Debtor executed 90 promissory notes on behalf of both Premier Pulses and North Dakota Port Services memorializing each loan Premier Pulses granted to North Dakota Port Services.  The loans totaled $7,246,000.  North Dakota Port Services repaid 15 of the loans, leaving an unpaid balance of $6,280,240.  Without United Pulse's share of the USDA proceeds, Premier Pulses did not generate income sufficient to finance the loans it made to North Dakota Port Services.[10]  Debtor acknowledged that USDA contract proceeds served as the source of funds Premier Pulses loaned to North Dakota Port Services.

---

[10] Premier Pulses realized a positive net income ranging from $121,018.54 to $397,279.79, from 2012 to 2016, the years it contracted with United Pulse.

On November 17, 2016, United Pulse and Premier Pulses entered a
Reaffirmation and Forbearance Agreement.  The agreement specified that the sum
Premier Pulses owed United Pulse totaled $6,576,370.  Premier Pulses agreed to pay
the debt, and United Pulse agreed not to demand payment or initiate suit against
Premier Pulses to enforce the agreement until January 2, 2017.  On the same date,
Debtor signed a Guaranty and Forbearance of Liens on behalf of North Dakota Port
Services.  North Dakota Port Services guaranteed the payment of Premier Pulses'
$6,576,370 debt to United Pulse and agreed not to grant any additional security
interests in its real or personal property assets.  Premier Pulses made no payments to
United Pulse after the parties entered these agreements.

On December 2, 2016, Bartsch informed Debtor that United Pulse planned to bid
directly on contracts with USDA and to stop contracting with Premier Pulses.  Ex. T-38.
Bartsch explained that, at this point, "you come to the realization that the investment's
not gonna come in, and that we need to take other steps to recoup our funding."
Bartsch estimated that the "volume of business" between United Pulse, Premier Pulses
and USDA from 2011 to 2016 totaled approximately $90 million.

When asked why United Pulse continued to work with Premier Pulses for two
years after United Pulse first discovered the arrearages and to allow the debt to grow by
another $3 million between the two reaffirmation agreements, Bartsch again explained
that United Pulse wanted to continue to partner with Premier Pulses "to hopefully work
out of the situation.  We'd get the funding so we'd get paid because we felt that was
probably the best way for us to get our funding versus not working with them at all.  So
we continued to do that for a period of at least two years."  Bartsch maintained that

16

United Pulse would not have continued contracting with Premier Pulses if there had

been "no hope for investment" in North Dakota Port Services.

Although Bartsch lost confidence that North Dakota Port Services could or would

secure investment income, he pointed to no evidence showing Debtor lied about the

potential investors.  In fact, based on his limited knowledge, Bartsch conceded that

none of Debtor's emails included false representations regarding possible investors or

investments in North Dakota Port Services.

Debtor testified that he continued to communicate with Sprague about possible

investors or interim financing throughout the time Debtor communicated with Bartsch

about possible investors.  At trial, Debtor insisted that he completely believed all of his

representations to United Pulse/Bartsch regarding prospective investments because he

had confidence in both Sprague's and Murphy's abilities and assurances.  Debtor

claims he never received any indication or report from anyone suggesting the

intermodal project was not feasible or that his fundraising efforts on behalf of North

Dakota Port Services would never come to fruition.  According to Debtor, the entire time

Premier Pulses contracted with United Pulse, he believed investors would provide

funding and he would be able to "make everyone whole."[11]

Debtor and Sprague continued their search for interim financing or an investor

until December 31, 2018.  Although neither Premier Pulses nor North Dakota Port

---

[11] In several emails between Sprague and Debtor, Debtor itemized the individual
components of the investment funds they anticipated receiving, and he specified which
portion of the investment funds he intended to use to pay Premier Pulses in full.  See
Ex. 217 (dated June 22, 2014, specifying "4,200,000 plus some change" to Premier
Pulses); Ex. 219 (dated July 31, 2014, allocating $4,600,000 to pay off Premier Pulses);
Ex. 230 (dated March 13, 2015, specifying "$16 million of repayment of existing debt").

Services exist anymore, Debtor remains in contact with Murphy.  According to Debtor, they continue to contemplate creating "The Port of North Dakota," which would "reserve this money, and then we would go back and look at the purchase of the former facility, along with paying off the indebtedness to those that helped support North Dakota Port Services, as well as Premier Pulses, and Premier Pulses could pay off [United Pulse], and, at the end of the day, I personally would be made whole for what has been my entire life dumped into this facility."

### C.    Bankruptcy

Debtor filed a voluntary petition for bankruptcy relief under Subchapter V of Chapter 11 of the Bankruptcy Code on November 9, 2020.

### D.    Judgment as a Matter of Law on Section 523(a)(2)

At the close of United Pulse's case in chief, Debtor moved for judgment as a matter of law on United Pulse's section 523(a)(2) and (6) causes of action.  The Court granted Debtor's motion in part and dismissed United Pulse's causes of action under section 523(a)(2)(A) and (B).  The Court denied Debtor's motion for judgment as a matter of law on United Pulse's section 523(a)(6) cause of action.

## II.    CONCLUSIONS OF LAW

United Pulse claims Debtor willfully and maliciously injured it by converting $6,576,370 of United Pulse's property.  It seeks a determination that this debt is excepted from discharge under 11 U.S.C. § 523(a)(6).

Section 523(a)(6) provides that a discharge under section 1192 does not discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  To prevail on its section 523(a)(6) cause of action, United Pulse must prove three elements: "(1) the debtor caused an

injury to the creditor; (2) the injury must have been willfully inflicted—that is, the debtor must have desired the injury or must have been substantially certain that his conduct would result in the injury; and (3) the debtor's actions must have been malicious." Luebbert v. Glob. Control Sys., Inc (In re Leubbert), 987 F.3d 771, 778 (citing Blocker v. Patch (In re Patch), 526 F.3d 1176, 1180-81 (8th Cir. 2008)).  United Pulse must prove each element by a preponderance of the evidence.  See id. Courts narrowly construe exceptions to discharge to effectuate the "fresh start" of the Bankruptcy Code.  Cmty. Fin. Grp., Inc. v. Fields (In re Fields), 510 B.R. 227, 233 (B.A.P. 8th Cir. 2014) (citation omitted).

"It is well established in the Eighth Circuit that the elements of 'malice' and 'willfulness' must be separately analyzed."  Sailor Music v. Walker (In re Walker), 514 B.R. 585, 589 (B.A.P. 8th Cir. 2014) (citations omitted).  United Pulse offered evidence showing Debtor exercised dominion and control over more than $6.5 million of United Pulse's share of USDA contract proceeds and wrongfully deprived United Pulse of the payments owed to it by transferring them to North Dakota Port Services, and then spending the funds in defiance of United Pulse's rights.[12]  While this evidence, coupled with the stipulated debt to United Pulse, is arguably sufficient to establish injury to United Pulse and conversion under North Dakota law, the Court finds it unnecessary to analyze these issues because United Pulse failed to meet its burden of showing malice under section 523(a)(6).

---

[12] See Dairy Dept. of N.D. v. Harvey Cheese, Inc., 278 N.W.2d 137, 144 (N.D. 1979) ("The tort [of conversion] is generally committed by an unauthorized transfer or disposal of possession of goods to one who is not entitled to them.").

The Eighth Circuit Court of Appeals in <u>In re Leubbert</u> articulated the standard for malice:

> Malice requires "conduct targeted at the creditor at least in the sense that the conduct is certain or almost certain to cause harm." <u>In re Waugh</u>, 95 F.3d at 711 (citation omitted). Malice is only implicated by "conduct more culpable than that which is in reckless disregard of creditors' economic interests and expectancies." <u>In re Long</u>, 774 F.2d at 880. "[K]nowledge that legal rights are being violated is insufficient to establish malice, absent some additional aggravated circumstances." <u>Id.</u> at 881 (citation omitted). "While intentional harm may be very difficult to establish, the likelihood of harm in an objective sense may be considered in evaluating intent." <u>Id.</u> A robust collection of bankruptcy court and circuit court authority suggests that the point of the malice inquiry is to determine whether the debtor's conduct was "aggravated" or "socially reprehensible" such that an imputation of malice is justified. <u>In re Blankfort</u>, 217 B.R. 138, 143–44 (Bankr. S.D.N.Y. 1998) (collecting cases); <u>see also</u> <u>In re Khafaga</u>, 419 B.R. 539, 550 (Bankr. E.D.N.Y. 2009).

987 F.3d at 780-81.

United Pulse argues Debtor's "actions in funneling USDA payments to [North Dakota] Port Services were malicious." Doc. 103 at 12. In support of this claim, United Pulse highlights North Dakota Port Services' loss of between $650,000 and $4,600,000 each year that Premier Pulses contracted with United Pulse and claimed "North Dakota Port Services was hemorrhaging money." Doc. 103 at 12. To provide interim financing and maintain progress on North Dakota Port Services' intermodal facility development plans, Debtor—in his role as President and CEO of Premier Pulses—transferred funds to North Dakota Port Services. Debtor conceded that USDA contract proceeds served as the source of these funds, and it is apparent that United Pulse's share of these proceeds comprised a significant part of these transfers. United Pulse claims that this concession and other evidence shows "United Pulse was Premier Pulses' only substantial client" and that Debtor deliberately targeted United Pulse "as Johnson's only

source of significant income." Id.  United Pulse also suggests that Debtor knew "there

was no way Premier Pulses was going to be able to repay the arrearages caused by its

transfers to [North Dakota] Port Services because its historical cash flows never

generated significant enough income to repay the arrearage." Id.

     While the evidence shows that Debtor transferred some of the USDA contract

proceeds owed to United Pulse to North Dakota Port Services, United Pulse's claim that

Debtor knew Premier Pulses would never repay the arrearages owed to United Pulse

ignores Debtor's repeated—and credible—testimony that Debtor believed investors or

lenders would provide funds to North Dakota Port Services, allowing it to repay Premier

Pulses, which he maintains would, in turn, pay United Pulse.

     United Pulse dismisses this testimony, arguing that Debtor knew or should have

known that no investors were seriously interested.  Debtor never received a firm

commitment from any investor, which United Pulse claims shows that Debtor knew

investors would never provide the necessary funding or, at the very least, establishes

Debtor's willful disregard of the truth.

     From a subjective perspective, Debtor repeatedly testified that he believed

several investors were seriously considering investing.  According to Debtor, the actions

and representations of Globalvia, Murphy's client, and the potential investor who sent

North Dakota Port Services the $4 million check, all substantiated his confident belief

that North Dakota Port Services would acquire funds to invest in business development

and to repay Premier Pulses and United Pulse.  Sprague emailed Debtor about many

investors interested in North Dakota Port Services, and Debtor testified about interest

from other potential investors throughout the time at issue in this case.  Contrary to

United Pulse's argument, Debtor's testimony regarding his attempts to generate funds to develop the intermodal transportation facility and to pay creditors shows a lack of malice.[13]

Debtor's testimony regarding his intent is not the sole consideration, however. The malice assessment also includes the likelihood of harm in an objective sense.  See In re Leubbert, 987 F.3d at 780.  Uncontroverted evidence received at trial suggests intermodal shipping is an efficient and cost-effective method to transport goods, and a transportation hub serving the upper midwestern region of the country may offer economic opportunities for businesses in North Dakota.  Debtor outlined the aggressive steps he took on behalf of North Dakota Port Services to launch the creation of an intermodal shipping facility, including securing interim financing from a local lender, building an office, completing subsurface work, sewer and water projects and installing tracks.  Emails and other documents supplemented by Debtor's testimony show Debtor's commitment to fundraising and demonstrate that North Dakota Port Services' intermodal transportation project generated genuine interest from a number of investors. For example, the evidence regarding Debtor's communications with Globalvia suggests

---

[13] See Barclays Am./Bus. Credit, Inc. v. Long (In re Long), 774 F.2d 875 (8th Cir. 1985) (affirming the finding of a lack of malice where a debtor diverted funds owed to a creditor in an attempt to save his business and ultimately pay off that creditor and others); Reshetar Sys., Inc. v. Thompson (In re Thompson), 458 B.R. 504, 510-511 (B.A.P. 8th Cir. 2011) (affirming the bankruptcy court's finding that a debtor did not act with malice where "[T]here just isn't the evidence [of malice] here because the actions of the debtor . . . all were undertaken according to his really uncontroverted testimony, in an effort to try to make good out of a bad situation . . . .  [T]he evidence doesn't support any guile, any intent to shaft anybody on the part of [Construction 70] or [Debtor]."); Johnson v. Logue (In re Logue), 294 B.R. 59, 63 (B.A.P. 8th Cir. 2003) (concluding that "efforts to maintain a business, including efforts to obtain alternate financing may be evidence of a lack of malice").

that the parties spent considerable time, effort and expense to reach a mutual

agreement to develop an intermodal transportation facility, but Globalvia withdrew for

reasons unclear to Debtor.  Despite this setback, Debtor, Sprague and Murphy

generated interest from other investors who seriously considered offering financial

support to North Dakota Port Services.  Email communications between Debtor and

Murphy show Murphy's client was genuinely interested in investing in the intermodal

transportation facility.  Likewise, the $4 million check from a potential investor evidences

genuine interest in North Dakota Port Services' business development ideas.  While

none of these leads generated in 2014 or earlier resulted in funding, Sprague emailed

Debtor about an investment deal with a possible closing date of May 1, 2015.

Additionally, Debtor testified about other potential investors who continued to express

interest in 2016 and beyond.

Although Debtor and North Dakota Port Services' brokers and agents generated

more viable investment candidates in 2012 through 2014 than those it solicited in 2015

and 2016, the Court is not convinced that the reasonableness of Debtor's belief he

would eventually secure funding diminished to the point of becoming an unreasonable

"farce" intended to mask his intent to defraud United Pulse.  Rather, when viewed in its

entirety, the evidence establishes an objectively reasonable basis for Debtor to believe

that one or more of these investors would offer funds sufficient to develop the

intermodal transportation facility and to pay North Dakota Port Services' debt to Premier

Pulses.  Debtor's subjective belief together with an objectively reasonable basis to

believe that Debtor would eventually generate investments in North Dakota Port

23

Services sufficient to pay creditors negates a finding of malice, absent aggravating or socially reprehensible circumstances that impute malice.

United Pulse argues Debtor's behavior shows the "aggravated circumstances" necessary to prove malice.  In connection with this assertion, it claims Debtor "knew what he was doing; he was trying to save his own skin by using United Pulse's funds." Doc. 103 at 14.  Given the context of this argument, the Court assumes United Pulse is referring to Debtor's interest in recouping the funds he loaned to North Dakota Port Services.  More specifically, United Pulse suggests that Debtor "kept stringing United Pulse along to keep the USDA funds flowing into Premier Pulses" so that he "would have a chance at recouping his $1,391,500 loan" to North Dakota Port Services.  Doc. 103 at 13.

Financial records show Debtor's personal loans to North Dakota Port Services grew from $570,000 in 2012 to $1,550,120.86 in 2016.  Although United Pulse suggests that Debtor's interest in recouping his investment served as motivation to continue "the charade," Debtor's personal investment in North Dakota Port Services also demonstrates that he believed in the business plan and shows confidence in his ability to generate investment income.  If the evidence established that Debtor prioritized repayment of his personal loans over the interests of other investors, owners or creditors, the Court might accept United Pulse's characterization.  This does not appear to be the case.  There is no evidence that Debtor used the money Premier Pulses loaned to North Dakota Port Services to repay his personal loans to North Dakota Port Services.  See Ex. T-14 and T-15.  In fact, North Dakota Port Services' debt to Debtor for his personal loans continued to grow from 2012 to 2016.  United Pulse offered no

other evidence suggesting Debtor personally benefited from the transactions at issue in

this case.  Accordingly, the Court finds that Debtor's personal investments in North

Dakota Port Services bolster his testimony that he believed North Dakota Port Services

would ultimately solicit the capital it needed to fund the project and repay creditors and

investors.

Further, other circumstances negate a finding that Debtor's conduct was

aggravated or "socially reprehensible."  See In re Leubbert, 987 F.3d at 780.  For

example, when United Pulse inquired about Premier Pulses' payment arrearages in

early 2014, Debtor told United Pulse that Premier Pulses used USDA contract proceeds

to fund loans to North Dakota Port Services, and it was apparent that United Pulse's

share of these proceeds comprised a significant part of these loans.  Although United

Pulse did not consent to Premier Pulses using money owed to it to fund additional loans

to North Dakota Port Services, it also did not prohibit Premier Pulses from making

additional loans to North Dakota Port Services.  Knowing that Premier Pulses used

money owed to it from the USDA contracts, United Pulse opted to continue doing

business with Debtor and Premier Pulses, "hoping the investment money would come

in."[14]  It is possible that United Pulse, like Debtor, believed in the viability of investment

as the best avenue to achieve payment.  Bartsch's testimony suggests this might be the

case.  It is also possible United Pulse did not want to interrupt its relationship with

Premier Pulses given the roughly $90 million in business generated between United

Pulse, Premier Pulses and USDA between 2011 and 2016.  Regardless, Debtor never

---

[14] See Brown v. Heister (In re Heister), 290 B.R. 665, 675 (Bankr. N.D. Iowa
2003) (finding no aggravating circumstances where the parties' relationship remained
amicable well after the debtor used proceeds owed to the creditor for his own use).

hid the fact that he transferred some of United Pulse's share of USDA contract proceeds from Premier Pulses to North Dakota Port Services, and there is no evidence that he lied to United Pulse about potential investors or his efforts to generate funds. Given the totality of circumstances, the Court is not convinced that United Pulse met its burden of showing "socially reprehensible conduct" or "aggravating circumstances" sufficient to prove malice. Debtor's conduct unquestionably shows reckless disregard of United Pulse's economic interests and expectancies, but absent additional aggravated circumstances, his knowledge that he was violating United Pulse's legal rights is insufficient to establish malice. See In re Leubbert, 987 F.3d at 780. Because United Pulse failed to prove Debtor acted with malice, its claim under section 523(a)(6) fails.

## III.    CONCLUSION

The Court considered all other arguments and deems them to be without merit. For the reasons stated above and at trial, it is **ORDERED** that United Pulse's claims and causes of action under 11 U.S.C. § 523(a)(2), (4) and (6) are dismissed with prejudice.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated:  November 17, 2022.

SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT